UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  1:24-CR-227 |
|  | ) |  |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| EVAN A. GALASSO, | ) | **MEMORANDUM OPINION** |
|  | ) | **AND ORDER** |
| Defendant. | ) |  |

Before the Court is Defendant Evan Galasso's ("Defendant" or "Galasso") motion to suppress statements made during the execution of a search warrant and later statements made during and in relation to a polygraph examination.  (Doc. 20.)  The government timely opposed the motion.  (Doc. 22.)  An evidentiary hearing was held on January 27, 2025.  Special Agent Madalyn Oltman ("SA Oltman") and Special Agent Matthew Scalisi ("SA Scalisi") testified about the execution of the search warrant and Galasso's initial statements.  SA Scalisi also testified about introducing Galasso to polygraph examiner Special Agent Sean Pieja ("SA Pieja") who, in turn, testified about the polygraph examination.

For the reasons stated herein, Defendant's motion is GRANTED in part and DENIED in part.

**I.     Background**

On May 29, 2024, at approximately 6:00 a.m., 17 federal law enforcement agents, accompanied by necessary support personnel, executed a search warrant at Defendant's

residence in Cleveland Heights, Ohio.[1] Defendant was home at the time, as was his wife and her adult son. All three walked out of the home as instructed. All three were escorted to separate vehicles as agents secured the home.

Defendant was placed in the backseat, driver side, of an unmarked sport utility vehicle. The vehicle was equipped with a recording device. (*See* Doc. 21; Defendant's Exhibit A ("Def't Ex. A").)

As the recording begins, the backseat is empty, but the audio captures agents explaining the need to conduct a pat-down of Galasso. (Def't Ex. A at 0:00–0:37.) Galasso appears in the recording handcuffed and being seated in the backseat. (*Id.* at 0:38.) After being asked by SA Oltman if he was comfortable, Galasso said he was not. (*Id.* at 3:23–3:29.) As SA Oltman looked for a key to remove the handcuffs, she told Galasso: "I just want to explain this [is] just for officer safety that we have to come and do these things and, um, that you're not under arrest at the moment, okay?" (*Id.* at 3:50.)[2] Galasso replied, "Okay." (*Id.* at 3:56.) Within about two minutes, the handcuffs were removed. (*Id.* at 5:26.)

SA Oltman asked Galasso if he needed to go to work that day, which prompted him to share the thought that his employer was responsible for the law enforcement presence. (*Id.* at 6:20–7:08.) SA Oltman told Galasso that she and another agent would soon explain what the

---

[1] There was a discrepancy in the testimony about the time of day the search warrant was executed. Based on SA Scalisi's testimony, the recording, and the undisputed fact that Galasso signed consent forms in the FBI's Cleveland office at approximately 8:30 a.m., the record supports a finding that the execution of the search warrant occurred around 6:00 a.m. and not 7:00 a.m. as otherwise stated.

[2] The parties dispute the accuracy of the transcript. The Government submitted the transcript as Government's Exhibit 1A. The Court has reviewed the transcript and the recording. Inaccuracies exist in the transcript. The Court therefore relies only on the recording itself. *See United States v. Wilkinson*, 53 F.3d 757, 762 (6th Cir. 1995).

search was about and how long it was likely to take. (*Id.* at 8:38–8:58.) Defendant responded, "Okay." (*Id.* at 8:59.) Immediately thereafter, SA Oltman asked: "Are you okay? Do you need water or anything?" (*Id.* at 9:00.) Defendant did not respond. (*Id.*) Approximately 30 seconds later, the following exchange occurred:

| | |
|---|---|
| SA Oltman: | And there was another, um, male that was here. Who was that? |
| Defendant: | I'm sorry, I'm not answering [SA Oltman speaking: is who…?] any more questions without an attorney. No more questions. |
| SA Oltman: | I can't hear you. What? |
| Defendant: | I'm not answering any more questions. |
| SA Oltman: | You're not answering any more questions? |
| Defendant: | No. |
| SA Oltman: | Okay. |

(*Id.* at 9:29–9:44.)

After approximately 19 minutes, SA Scalisi got into the car. (*Id.* at 19:01.) He sat next to Galasso in the backseat. (*Id.*) Up to this point, SA Oltman had either remained in the car with Galasso or stood directly outside the car near the rear, driver side door. SA Oltman testified that if the door was opened, she would have stood between the opened door and Galasso. When SA Scalisi got into the car, SA Oltman was in the driver's seat. SA Scalisi identified himself to Defendant. (*Id.* at 19:16.) SA Oltman also asked if Defendant needed anything, including any clothing brought to him. (*Id.* at 19:16–20:03.) Defendant declined. (*Id.*)

SA Scalisi asked general questions about living in the area and was informed by SA Oltman that Defendant had been fired "and not in a good way either." (*Id.* at 20:20–20:48.) After SA Scalisi sympathized with him, Galasso asked: "What's this all about?" (*Id.* at 20:50–20:52.) The recording captures approximately five minutes of questions and answers relating to

the investigation of illegally downloaded child pornography. (*Id.* at 20:53–26:30.) At no time during this five-minute exchange did Galasso decline to answer their questions. (*Id.*) At approximately 26:30, however, the following exchange occurred:

> SA Oltman: Okay. And when you download these, um, anime, is there a specific, like, folder that you put them in? Or a place on your computer?
>
> Defendant: I'm not gonna answer anymore questions.
>
> SA Oltman: Why is that?
>
> Defendant: Because I'm obviously accused of something and I don't think that I've done anything wrong and the rest is up to you. I mean, I haven't got any evidence of anything illegal, soooo I don't know why uh –
>
> SA Oltman: Okay. So, here, let me be frank with you then. Um, are we going to find child pornography from BitTorrent?
>
> Defendant: No.
>
> SA Oltman: Are, have you ever seen child pornography?
>
> Defendant: Years and years ago I've seen it.

(*Id.* at 26:30–27:22.) Questioning continues. (*Id.* at 27:23–28:59.)

SA Oltman stepped out of the car for approximately thirteen minutes, though she does come back briefly to ask Galasso questions about the home. (*Id.* at 29:00–42:38.) After she stepped out, SA Scalisi explained the importance of Galasso's cooperation. (*Id.* at 29:00–30:39.) He then asked Galasso how he met his wife, and Galasso responded, "I'm not gonna answer any more questions." (*Id.* at 30:41–30:46.) SA Scalisi immediately acknowledged the statement and stopped asking questions related to the investigation. (*Id.* at 30:46–30:48.) Approximately two minutes later, SA Scalisi told Galasso "We have a search warrant, right, but, like, right now you're not under arrest, you know that right?" (*Id.* at 32:38–32:44.) Galasso responded:

"Whatever." (*Id.* at 32:46.)[3] At approximately 41:54, SA Oltman got back in the car. She told Galasso a preliminary investigation of Galasso's phone revealed he was "their guy with the child pornography." (*Id.* at 41:54–42:15.) Questions specific to the investigation were put to Defendant, on and off, for the next nine minutes. (*Id.* at 42:15–51:30.)

II.     **Legal Analysis**

    A.     **Custodial Interrogation**

The Fifth Amendment's Self-Incrimination Clause provides that "no person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. Any statements "made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprised of [this] constitutional right and [] validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Before any custodial interrogation begins, the individual must be advised that (1) he has the right to remain silent; (2) his statements may be used against him in court; (3) he has the right to have an attorney present with him during questioning; and (4) if he cannot afford an attorney, one will be appointed for him. *Miranda*, 384 U.S. at 479. It is Defendant's burden to prove *Miranda* warnings should have been given. *United States v. Lawrence*, 892 F.2d 80 (6th Cir. 1989) (unpublished table decision).

The parties do not dispute Galasso was interrogated. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (interrogation is a "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect"). They also

---

[3] At approximately 38:40, SA Scalisi stepped out of the vehicle. The door did not close. (*Id.* at 38:50.) SA Scalisi asked about a tattoo. (*Id.* at 39:31.) The door remained open until SA Scalisi got back into the car when SA Oltman returned. (*Id.* at 41:53.)

do not dispute *Miranda* warnings were not given while on scene. (Doc. 20 at 79.) The dispute is whether Galasso was in custody.

Custodial interrogations are those in which law enforcement officers initiate questioning "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *see also Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). A court must examine the "objective circumstances of the interrogation, not [] the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. At bottom, the inquiry is "whether, under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (citing *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)). Four, non-exhaustive factors aid this inquiry: the location of the interview; the length and manner of the questioning; whether there was any restraint on the individual's freedom of movement; and whether the individual was told he did not need to answer questions. *United States v. Levenderis*, 806 F.3d 390, 400 (6th Cir. 2015) (citing *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010)).

*Location of the interview*. Galasso was interviewed while seated in the backseat of a law enforcement vehicle. The vehicle was parked on a public street in view of his home.

At the hearing, the government argued Galasso's detention in the vehicle is tantamount to being in his home. (Doc. 22 at 111–12.) At home interviews, the government rightly noted, are rarely viewed as custodial. *United States v. Conder*, 529 F. App'x. 618, 622 (6th Cir. 2013). Galasso was not in his home, but he was in a vehicle on a public street in front of his home. *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) (discussing interviews conducted in

public spaces as noncustodial, including interviews in a vehicle parked in a public space). This factor weighs against a custodial finding.

*Length and Manner of Questioning*. The total length of the recording is two hours and fifty-five seconds. There were intermittent periods of questioning during the hour and a half Galasso was in the backseat of the car.

The manner of questioning changed over the course of the interview. At 9:29 through 9:44 of the recording, when asked about the other male in the home, Galasso refused to answer any more questions. This refusal is honored.

A notable dispute is whether SA Oltman ignored Galasso's statement he wanted counsel present. Galasso invoked his right to counsel the first time he stated his refusal to answer questions. To be sure, the recording captured Galasso saying he will not answer any more questions without an attorney. (Def't Ex. A at 9:30.) But the recording also captured SA Oltman asking him to repeat himself. (*Id.*) At the hearing, SA Oltman testified she was unable to hear Galasso clearly at this point in the interview. The Court credits her testimony that she did not hear Galasso's comment about an attorney. And the recording captured her immediately saying "I can't hear you. What?" (*Id*. at 9:37.) Galasso repeated himself, stating he will not answer any more questions. Critically, Galasso did not restate his request for counsel. (*Id.*) Such a request for counsel was neither heard in the first instance nor repeated when given an opportunity to do so. Thus, while the Court finds the agents disregarded his refusal to stop answering questions, they did not disregard his request for counsel.

Questioning only began anew when Galasso asked the agents to explain what the search was about. (*Id*. at 19:01.) But it is the second time Galasso asserted his refusal to answer questions that the tone and manner of questioning changed. At 26:30 in the recording, Galasso

refused again to answer questions and acknowledged that he may be a suspect in their investigation. Instead of honoring his refusal to answer like had been done before, he was met with more direct and pointed questions.[4] (*Id*. at 26:30–27:22.) Additionally, in reviewing the recording in its entirety, Galasso refused to answer questions a third time when he was alone with SA Scalisi. (*Id*. at 30:41–30:46.) But when SA Oltman rejoined them in the car, the interrogation continued with no mention that Galasso had again stated he would not answer questions. (*Id*.)

Had the agents consistently honored Galasso's refusals to answer their questions, this factor would weigh differently. Honoring such a refusal reinforces the voluntariness of providing responses. Not honoring such a refusal has the opposite effect. This factor weighs in favor of custody.

*Restraint on Freedom of Movement*. When SA Oltman put Galasso in the backseat, she told him it was for officer safety. She removed the handcuffs shortly thereafter. (*Id.* at 5:26.) Immediately before removing the handcuffs, SA Oltman told Galasso he was "not under arrest at the moment." (*Id*. at 3:50.) As SA Oltman testified, Galasso was always in the company of either one or two agents. SA Scalisi testified that the rear doors could open, which Galasso observed approximately 40 minutes after being placed in the vehicle, when he saw SA Scalisi open the door and step out of the vehicle. SA Scalisi, like SA Oltman, stood directly outside of the open door. Agents offered to bring Galasso water and clothing. (*Id*.) Galasso was not told

---

[4] In argument, the Government said Galasso's statement ending with "soooo I don't know why uh" was a question that invited the agents to continue their line of questioning. In reviewing the recording, however, the Government's position is not supported. Galasso was mid-sentence and stalled with a "soooo I don't know why uh" before being asked a question about BitTorrent and child pornography. This "soooo I don't know why uh" was not a question.

he could step out of the vehicle until approximately one hour and 30 minutes after getting into the vehicle.

In argument, the government stressed the need for certain precautions during the execution of search warrants, including detaining individuals and limiting their movements. To be sure, officers have the authority "to detain the occupants of the premises while a search is conducted" within the vicinity of the of the premises to be searched. *Bailey v. United States*, 568 U.S. 186, 193, 133 S.Ct. 1031, 185 L.Ed.2d 19 (2013) (quoting *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). Reasonable and necessary precautions, however, do not foreclose a finding that the objective reality of the circumstances would lead one to conclude they are "restrained to a degree associated with formal arrest." *Luck*, 852 F.3d at 621.

Evaluating this factor is a close call. Restraining Galasso's freedom of movement was necessary during the search, but the length of time he was maintained in the car with no ability to move from the back seat (approximately an hour and a half), that he was not told he could leave the premises during the search, and the constant presence of agents seated near him or directly outside the car door are facts that ultimately lean in favor of a custodial finding.

*Statements that Galasso did not need to answer questions*. Galasso was never told he could refuse to answer questions. Twice he was told he was not under arrest, but those statements were qualified with "at the moment" or "right now." (Def't Ex. A at 3:50, 32:38.)[5] The Sixth Circuit has recognized that advising an individual they can refuse to answer questions

---

[5] Galasso was arrested at the conclusion of the polygraph examination. The record is not clear as to what the charges were, but SA Pieja seemed to recall the charges included child pornography and a hands-on offense.

or they are free to leave, while sounding in *Miranda* warnings, must be considered in its "totality of the circumstances" analysis. *See Panak*, 552 F.3d at 465.

Galasso was never told he could refuse to answer questions. His first refusal to answer questions was honored. (Def't Ex. A at 9:29–9:44.) His second refusal, at approximately 26 minutes and 30 seconds into the interview, was not. (*Id*. at 26:30–27:22.) Galasso's third refusal to answer questions was ultimately ignored as well. (*Id*. at 30:41–30:46.) This factor weighs in favor of a custodial finding.

Accordingly, given the totality of these circumstances, the Court finds that no reasonable person would have felt free to terminate the interrogation at the recording's 26 minute and 30 second mark. *Thompson v. Keohane*, 516 U.S. 99, 105, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Accordingly, Galasso's statements after 26 minutes and 30 seconds into the interrogation are suppressed.

### B. Polygraph Examination

"[T]he task of defining 'custody' is a slippery one, and '[agents] investigating serious crimes cannot realistically be expected to make no errors whatsoever.'" *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (quoting *Michigan v. Tucker*, 417 U.S. 433, 446, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). In instances in which law enforcement officers err in assessing the custodial nature of the interaction, that error "should not breed the same irremediable consequences as police infringement on the Fifth Amendment itself." *Id.* An individual "who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318.

The admissibility of later statements hinges on whether a reasonable person would have viewed the later questioning "as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *United States v. Ray*, 803 F.3d 244, 272–73 (6th Cir. 2015) (quoting *Missouri v. Seibert*, 542 U.S. 600, 616, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion)).  The factors to consider are: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second interrogations, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.*; *see also United States v. Woolridge*, 64 F.4th 757, 761 (6th Cir. 2023) (discussing that the *Seibert* factors are among those things a court should consider).  It is the government's burden to prove the admissibility of the statements. *United States v. Ray*, 690 F. App'x 366, 372 (6th Cir. 2017).

Approximately one hour and 25 minutes after the recoding began, SA Oltman returned to the vehicle and explained that "hands-on offenses" are a significant concern for law enforcement.  (Def't Ex. A at 1:26:07.)  She asked Galasso if he would consent to a polygraph examination, to which Galasso promptly responded: "Sure." (*Id.* at 1:26:23.)  SA Oltman then explained the polygrapher was at their office downtown, and—since the polygraph was voluntary—he could drive himself or ride with them. (*Id.* at 1:26:25–1:26:50.)  Galasso said in response: "I don't wanna drive down there." (*Id.* at 1:26:53.)  After confirming Galasso was requesting to ride with them, SA Oltman, SA Scalisi, and Galasso got out of the vehicle they were in and walked back a few cars to SA Oltman's car. (*Id.* at 1:26:53–1:27:11.)  Galasso was neither restrained while they switched cars nor while he was driven to the office.

SA Scalisi testified they arrived at the FBI's Cleveland office shortly before 8:30 a.m.  The agents and Galasso entered through the front doors and went to the polygraph examination room.  SA Scalisi introduced Galasso to SA Sean Pieja, one of the FBI's certified polygraph examiners.  SA Scalisi stayed only so long as to observe SA Pieja give *Miranda* warnings and explain the advice of rights and consent forms to Galasso.

SA Pieja testified about advising Galasso of his rights, the advice of rights and consent forms, and the polygraph examination itself.  (Doc. 22-3.)  Specific to the Advice of Rights form, under the section labeled "Your Rights," the required *Miranda* warnings are listed.  Directly beneath that section is the Consent section where Galasso acknowledged his rights and consented to proceeding without counsel.  (*Id.*)  There is no dispute that Galasso signed the form.

Galasso also executed a Consent to Interview with Polygraph form, which includes a section in which the purpose of the examination is listed.  In this case, the form states "sexual contact and/or activity with a minor(s)."  (Doc. 22-2 at 152.)  The form confirms that the examination is voluntary.  (*Id.*)  In a section similarly labeled "Your Rights," Galasso was advised in writing that he could refuse the examination, stop it at any time, and refuse to answer individual questions.  (*Id.*)  A Waiver and Consent provision contained language to ensure consent is both knowing and voluntary.  (*Id.*)  Again, there is no dispute Galasso signed the form.

After the forms were explained and executed, SA Pieja began the polygraph examination, which typically involves three steps: pre-test, test, and post-test.  SA Pieja received limited information from SA Scalisi about Galasso's prior statements concerning child pornography.  Specific details were not provided to him, however.  But, based on SA Pieja's training and experience, even this limited information informed his process; the examination needed to take into account possible fantasies associated with viewing online images and hands-on

offenses.  So, while there was some overlap in the questions put to Galasso that day, SA Pieja credibly explained why any overlapping questions were limited and also necessary to ensure the integrity of the polygraph examination.

Galasso's first interview included admissions about accessing, viewing, and storing child pornography.  Only the information about viewing was relayed to SA Pieja.  There was minimal overlap between the first and second interviews.  The first and second interviews were separated by time and location.  Indeed, the second interview occurred at the FBI's Cleveland office *after* Galasso was given the opportunity to drive himself there—an opportunity he declined.  Galasso was presented with and executed forms recognizing the voluntariness of the interview and his consent to proceed without counsel.  SA Pieja was not part of the search warrant execution team.  Galasso did not see SA Pieja until Galasso went to the office.  And based on SA Pieja's credible testimony, the second interview was treated as a separate interview that focused on the possible sexual assault of minors.  For these reasons, the second interview was untainted.

SA Pieja and SA Scalisi testified credibly about the polygraph examination.  Thus, there is no evidence of coercion.  Galasso knowingly and voluntarily waived his rights, consented to the terms on the forms, and consented to the examination itself.  Accordingly, Galasso's request to suppress statements made during or in relation to the polygraph examination is DENIED.

### III.  Conclusion

For the reasons explained above, Defendant's motion to suppress is DENIED as to Galasso's statements before 26 minutes and 30 seconds into the interrogation.  Defendant's motion is GRANTED as to statements made after 26 minutes and 30 seconds into the

interrogation. The motion is DENIED as to those statements made in connection with the polygraph examination.

**IT IS SO ORDERED.**

Date: February 21, 2025

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE